**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

MARY O. MENDEZ, ET AL.,

     Plaintiffs,             CIVIL NO. 14-7778(NLH/KMW)

v.                         OPINION

UNITED STATES OF AMERICA,
ET AL.,

     Defendants.

_____

**<u>APPEARANCES</u>:**

LOREN T. FINESMITH
1521 LOCUST STREET
10TH FLOOR, SUITE 1001
PHILADELPHIA, PA 19102
     On behalf of Plaintiffs Mary O. Mendez,
     Estate of Bryan Jadiel Mendez, and Miletzy Hernandez

JORDAN MILOWE ANGER
OFFICE OF THE U.S. ATTORNEY
970 BROAD STREET
7TH FLOOR
NEWARK, NJ 07102
     On behalf of Defendant United States of America

JARAD L. SILVERSTEIN
CAROLYN R. SLEEPER
PARKER MCCAY PA
9000 MIDATLANTIC DRIVE
SUITE 300
MOUNT LAUREN, NJ  08054
856-596-8900
     On behalf of Defendants Cindy Aves, Beryl Kelley, Christine
Ward, Cooper Anesthesia Associates, Cooper University Hospital,
and Cooper University Physicians

**HILLMAN**, District Judge

Presently before the Court is the motion (Docket No. 82) of the Defendants Cindy Aves, Beryl Kelley, Christine Ward, Cooper Anesthesia Associates, Cooper University Hospital, and Cooper University Physicians ("Defendants") for partial summary judgment as to any and all claims made by Plaintiff Miletzy Hernandez ("Miletzy" or "Hernandez").[1]  For the reasons expressed below, Defendants' motion will be granted.

## FACTUAL BACKGROUND

On July 20, 2010, Mary Mendez ("Mendez"), who was between 37 and 38 weeks pregnant, had a spontaneous rupture of her membranes and went to Cooper University Hospital for the delivery of her baby.[2] (Docket No. 75 at 8.)  She was moved to the labor room and electronic fetal and maternal heart rate monitors were placed on her within minutes of her arriving at the hospital. (Id.)  Dr. Chang, who was the attending physician for labor and delivery, had given her prenatal care and was

---

[1] Co-defendant, the United States of America, has moved to join this motion. (Docket No. 86.)  The Motion of the United States will be granted.

[2] The facts set forth in the Factual Background are from the allegations of the Amended Complaint.  We resolve all factual disputes and inferences in favor of Hernandez, the non-moving party. See Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).

aware of her gestational diabetes, her morbid obesity, and the large size of her baby. (Id.)

Dr. Chang informed Mendez that she would have a vaginal delivery but possibly with suction. (Docket No. 75 at 9.)  The plaintiffs allege that symptoms of ongoing fetal distress were not appropriately treated or were ignored by Doctor Chang, other doctors and nurses throughout Mendez's labor. (Id.)  Due to the fetus's failure to descend and a non-reassuring fetal heart rate, Dr. Chang decided to immediately perform a cesarean section. (Id.)  Twenty minutes later, at 3:35 a.m., all monitors were removed. (Id.)

Plaintiff was moved from the labor room to the operating room at around 4:00 a.m. (Docket No. 75 at 10.)  A fetal heart rate monitor was attached. (Id.)  Around that time, Mendez was given spinal anesthesia. (Id.)  The fetal heart rate dropped from 140 or more to 70's or 60's and just prior to beginning the cesarean section, to 50 beats per minute. (Docket No. 75 at 10-11.)  Delivery was extremely difficult and a tight nuchal cord was noted at the time of delivery. (Docket No. 75 at 11.)

The baby, Bryan Jadiel Mendez, was delivered at 4:35 a.m. (Id.)  Bryan "had a heart rate of approximately 10 to 20 beats per minute upon delivery and no heart sounds 30 seconds after birth." (Id.)  The baby was limp at birth and stopped moving.

(Id.)  The attempts to resuscitate the baby ended at 4:47 a.m. and he was pronounced dead at 5:00 a.m. (Id.)

Hernandez is Mendez's sister. (Docket No. 90-1 at 3.) Mendez and her daughter lived with Hernandez during Mendez's pregnancy and at the time Bryan was born. (Id.)  Mendez continued to live with Hernandez on weekends afterwards. (Id.) Hernandez sees Mendez's daughter daily and has a close relationship with her. (Id.)

Hernandez arrived at the hospital at 6:00 p.m. on the evening before the birth and stayed with her sister in the labor and delivery room until Mendez went into the operating room. (Id.)  Hernandez saw that her sister was connected to fetal heart rate monitors and heard conversations between the doctor and her sister as to whether Mendez should continue with natural childbirth or have a cesarean section. (Id.)  Hernandez believed the attending nurse, Beryl Kelly, R.N., was not providing Mendez and the baby with adequate care, including failing to use an internal fetal heart rate monitor in a timely manner and failure to give Mendez oxygen. (Docket No. 90-1 at 4.)

Hernandez dressed to go to the operating room for the cesarean section but was not permitted to enter. (Id.)  She was in the recovery room and within view of the operating room door. (Id.)  She saw a doctor and nurse running down the hall to the operating room. (Id.)  Seeing the staff running, she thought

4

Nurse Kelly, members of the obstetrics and gynecology (OB/GYN) team in the operating room or both had injured Mendez or the baby as a result of medical negligence. (Id.)  When the operating room door was open she saw Bryan intubated and motionless. (Id.)  She could not tell whether or not he was alive. (Id.)  About 25 minutes later, someone handed her the body of the deceased baby Bryan and she fainted. (Id.)

## PROCEDURAL BACKGROUND

Plaintiffs filed a complaint in the Superior Court of Camden County, New Jersey, Law Division against CAMcare, Dr. Chang, and the other Defendants in this action. (Docket No. 75 at 6.)  The United States of America, a Defendant, removed the action to the United States District Court, Camden vicinage. See Mary O. Mendez, et al. v. Eric Chang, D.O., et al., Docket No. 13-2274 (RMB)(D.N.J.).  The United States was substituted as the proper Defendant in place of CAMcare, Dr. Chang, and other employees of CAMcare. (Docket No. 75 at 7.)

The United States then filed a motion to dismiss Plaintiffs' claims for failure to exhaust their administrative remedies. (Id.)  The claims against the United States were dismissed and the remaining claims remanded to state court. Mary O. Mendez, et al. v. Eric Chang, D.O., et al., Docket No. 13-2274 (RMB)(D.N.J.)(Docket No. 9).  Plaintiffs timely filed Federal Tort Claims Act claims with the United State Department

of Health and Human Services (HHS). (Docket No. 75 at 7.)  HHS denied the claims. (Id.)  Plaintiffs had then exhausted their administrative remedies. (Id.)  The Superior Court of New Jersey dismissed Plaintiffs' state action without prejudice by agreement of the parties so Plaintiffs could reassert their claims in federal court. (Id.)

Mendez, individually and as the mother of Decedent in her own right and as Administratrix Ad Prosequendum of the Estate of Bryan Jadiel Mendez, and her sister, Hernandez, filed a new federal complaint (Docket No. 1) and an amended complaint (Docket No. 75) alleging a medical malpractice action against moving Defendants and others.  Hernandez seeks to recover on a claim of negligent infliction of emotional distress (Docket No. 75 at 23-25) and five other related claims as well (Docket No. 75.)  Presently before the Court is Defendants' motion for summary judgment as to all claims asserted by Hernandez. (Docket No. 82 at 11.)

### JURISDICTION and CHOICE OF LAW

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(b) and 28 U.S.C. § 1367(a) in that one of the Defendants is the United States.  The United States has sovereign immunity except where it consents to be sued. U.S. v. Bormes, --- U.S. ---, 133 S.Ct. 12, 16, 184 L.Ed.2d 317 (2012). The Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671

et seq., provides for a limited waiver of the sovereign immunity
of the United States. 28 U.S.C. § 2679(b)(1); White-Squire v.
U.S. Postal Service, 592 F.3d 453, 456 (3d Cir. 2010).

The FTCA gives a federal district court exclusive
jurisdiction over civil actions,

> on claims against the United States, for money damages
> . . . for injury or loss of property, or personal
> injury or death caused by the negligent or wrongful
> act or omission of any employee of the Government
> while acting within the scope of his office or
> employment, under circumstances where the United
> States, if a private person, would be liable to the
> claimant in accordance with the law of the place where
> the act or omission occurred.

28 U.S.C. § 1346(b); CNA v. U.S., 535 F.3d 132, 141 (3d Cir.
2008)(citing FDIC v. Meyer, 510 U.S. 471, 477, 114 S.Ct. 996,
127 L.Ed.2d 308 (1994)).

FTCA claims are governed by the substantive tort law of
the state where the acts or omissions occurred. See FDIC v.
Meyer, 510 U.S. at 477-78; Ciccarone v. United States, 486 F.2d
253, 257 (3d Cir. 1973).  We therefore apply New Jersey
substantive law to the allegations of the amended complaint.

**LEGAL STANDARD: MOTION FOR SUMMARY JUDGMENT**

Summary judgment is appropriate where the Court is
satisfied that "'the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to

a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477
U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(quoting
Fed.R.Civ.P. 56.)  An issue is genuine if it is supported by
evidence such that a reasonable jury could return a verdict in
the nonmoving party's favor. Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A
fact is material if, under the governing substantive law, a
dispute about the fact might affect the outcome of the suit. Id.
"In considering a motion for summary judgment, a district court
may not weigh evidence or determine credibility; instead, the
nonmoving party's evidence "is to be believed and all
justifiable inferences are to be drawn in his favor." Marino v.
Indus. Crating Co., 358 F.3d 241, 247 (3d Cir.
2004)(quoting Anderson, 477 U.S. at 255)(internal quotations
omitted).

     The moving party bears the initial burden of demonstrating
the absence of a genuine issue of material fact. Celotex, 477
U.S. at 323 ("[A] party seeking summary judgment always bears
the initial responsibility of informing the district court of
the basis for its motion, and identifying those portions of 'the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any,' which
it believes demonstrate the absence of a genuine issue of
material fact."(citation omitted); see also Singletary v. Pa.

Dept. of Corr., 266 F.3d 186, 192 n. 2 (3d Cir. 2001)("Although
the initial burden is on the summary judgment movant to show the
absence of a genuine issue of material fact, 'the burden on the
moving party may be discharged by "showing" — that is, pointing
out to the district court - that there is an absence of evidence
to support the nonmoving party's case' when the nonmoving party
bears the ultimate burden of proof.")(quoting Celotex, 477 U.S.
at 325).

Once the moving party has met this burden, the nonmoving
party must identify, by affidavits or otherwise, specific facts
showing that there is a genuine issue for trial. Celotex, 477
U.S. at 324.  A "party opposing summary judgment may not rest
upon the mere allegations or denials of the ... pleading[s]."
Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir.
2001)(internal quotations omitted).  To withstand a properly
supported motion for summary judgment, the nonmoving party must
identify specific facts and affirmative evidence contradicting
those offered by the moving party, Anderson, 477 U.S. at 256-57,
and do more than solely rest upon mere allegations, general
denials, or vague statements, Saldana, 260 F.3d at 232.

**ANALYSIS**

Hernandez asserts claims for indirect or bystander
negligent infliction of emotional distress against the United
States and the other Defendants. (Docket No. 90-1 at 4-5.)  Her

claims rest upon her contention that the Defendants negligently provided obstetrics care for her sister, Mary, and nephew, Bryan, during labor and delivery, such that he died shortly after birth.

In Portee v. Jaffee, 84 N.J. 88 (1980), the Supreme Court of New Jersey set forth a test for a bystander claim for negligent infliction of emotional distress when there is neither risk nor actual physical harm to the bystander. Id.  This "new species of negligence liability" was intended to protect an interest in personal emotional stability. Id. at 101.  This cause of action requires the perception of death or serious physical injury. Id.  The Court explained, "The harm we have determined to be worthy of judicial redress is the trauma accompanying the observation of the death or serious physical injury of a loved one." Id.  The Court observed, "The emotional harm following the perception of the death or serious injury to a loved one is just as foreseeable as the injury itself, for few persons travel through life alone." Id. at 101.

The Supreme Court of New Jersey held that a plaintiff must prove the following four elements in such a claim:  "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3)

observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." Id.

In Frame v. Kothari, 115 N.J. 638 (1989), the New Jersey Supreme Court set out the standard for an indirect claim for emotional distress resulting from a medical malpractice action. Gendek v. Poblete, 139 N.J. 291, 300 (1995).  The Frame standard is a modification of Portee:

> [A]n indirect claim for emotional distress attributable to medical malpractice must be based on evidence demonstrating that the victim was (1) a marital or intimate family member of the claimant, and that the claimant (2) witnessed the malpractice, and (3) immediately connected or associated the malpractice with the injury, and (4) as a result, suffered severe emotional distress.

Gendek, 139 N.J. at 300 (citing Frame, 115 N.J. at 643).

The Court discussed the "special requirements" applicable to indirect claims involving medical malpractice, wherein the claimant is required to show that he had "contemporaneously observe[d] the malpractice and its effects on the victim and that he [had been] shocked by the results." Gendek, 139 N.J. at 300 (quoting Carey, id. at 62).  The Court in Frame describes the special requirements as the "family member witnesses the physician's malpractice, observes the effect of the malpractice on the patient, and immediately connects the malpractice with the injury. . . ." Frame, 115 N.J. at 649.  The Court said, "The special requirements for establishing an indirect claim for

emotional distress that is based on medical malpractice are strictly applied." Gendek, 139 N.J. at 297 (citing Frame, 115 N.J. at 651-52.)

### Frame:  Intimate Familial Relationship

The central issue before this Court is whether Hernandez had an "intimate familial relationship" with her deceased nephew, Bryan, as required by Portee and Frame.  Under New Jersey law "intimate familial relationship" is to be construed restrictively.[3]  Plaintiffs have not provided the Court with any New Jersey case law holding that an aunt has an intimate familial relationship with the injured or deceased person in a bystander negligent infliction of emotional distress action. Nor are we aware of any such case law.  In 2012, the Supreme Court of New Jersey summarized the relationships it had to date recognized under Portee: "parent, child, spouse or an individual with whom one shares a marital-like or intimate familial relationship[.]" McDougall v. Lamm, 211 N.J. 203, 229 (2012). An aunt was not specifically included in the list.

---

[3] "In general, our Courts have applied all the elements of the Dillon-Portee test restrictively." Dunphy v. Gregor, 136 N.J. 99, 106 (1994).  Dillon v. Legg, 68 Cal.2d 728 (1968), is a California case involving bystander emotional distress, and was cited with approval in Portee.  Dunphy, 136 N.J. at 103.  In addition, the Dunphy Court said, "We have similarly encouraged narrow applications of the other prongs of the Dillon-Portee test." Id. at 107.

While the New Jersey courts have not expressly addressed whether an aunt-nephew relationship falls under Portee and Frame, it is useful to examine which relationships the courts have determined are in the protected class and the basis for the courts' determinations.  Certainly, a parent and child relationship is within the class of relationships that could be an intimate familial relationship.  For example, in the seminal case of Portee, a mother, who witnessed the suffering and death of her son who was trapped for over four hours between an elevator shaft and the door, had an intimate familial relationship with her son.

Other examples include: (1) a mother who watched her daughter die soon after an anesthesiologist negligently put fluids into her daughter's jugular vein, Polikoff v. Calabro, 209 N.J. Super. 110 (App. Div. 1986); (2) a mother who saw her son lying in the street after he had been hit by a bus, Mercado v. Transport of N.J., 176 N.J. Super. 234 (Law Div. 1980); and (3) the parents whose health care providers negligently treated their baby as deceased during labor and delivery, even though the baby was alive, Carey v. Lovett, 132 N.J. 44 (1993).  Thus, parents are clearly in the class of persons who could have an intimate familial relationship with a seriously injured or deceased person under New Jersey law.

13

The reason for including parents in the protected class is the profound parental emotional interest deserving protection from negligence.  The Court noted, "[O]nly the most profound emotional interests should receive vindication for their negligent injury." _Portee_, 84 N.J. at 98.  The Court explained, "[T]he interest assertedly injured is more than a general interest in emotional tranquility.  It is the profound and abiding sentiment of parental love." _Id_. at 97.  As to parental love, the Court explained: "Our analysis of the specific emotional interest injured in this case — a fundamental interest in emotional tranquility founded on parental love — reveals where the limits of liability would lie." _Id_. at 98.  Thus, in general, New Jersey courts have recognized parental love as a profound love deserving protection under New Jersey law.

_Portee_ and _Frame_ expressly included "marital" relationships in the definition of intimate familial relationships.  For example, the Court in _Jablonowska v. Suther_, 195 N.J. 91, 107 (2008), said _Portee_ requires that "plaintiff has a sensory, contemporaneous perception of severe injury to a spouse or close family member[.]"  The New Jersey Court also decided co-habitating fiancés, like spouses, are within this protected class. _Dunphy v. Gregor_, 136 N.J. 99 (1994).  In _Dunphy_, a fiancé who lived with her partner and who watched him die in a

14

traffic accident was deemed to have an intimate familial relationship with him.

Certainly not all relationships in New Jersey fall within the class of intimate familial relationships as defined by Portee and Frame.  A woman, who along with her husband took a child, who was a close family friend and neighbor, to visit a circus performance did not have an intimate familial relationship with the boy who was mauled to death by a leopard. Eyrich for Eyrich v. Dam, 193 N.J. Super. 244 (App. Div.), certif. denied, 97 N.J. 583 (1984).  She and the boy were not family. Id. at 259.  Also, a dog owner whose dog was mauled by another dog was not protected under this law. McDougall v. Lamm, 211 N.J. 203 (2012).[4]

Central to our analysis is the guidance of the Supreme Court of New Jersey which has encouraged its courts to construe

---

[4] Defendants cite Michelman v. Ehrlich, 311 N.J. Super. 57 (App. Div. 1998), in support of their argument that an aunt, like a grandfather, does not have an intimate familial relationship with her nephew.  In Michelman, a grandfather was denied his claim as to the "wrongful birth" of his grandchild. Id. However, a "wrongful birth" cause of action is different from the instant cause of action as only parents may bring a wrongful birth action. See id. at 69.  In Michelman, the court determined no duty of care was owed to the grandfather. Id.  The policy discussion in Michelman regarding wrongful birth, i.e. who has a right to terminate a pregnancy (not the grandfather), is not directly relevant to the tort in the instant action.  At least one New Jersey court has assumed a grandparent may have an intimate familial relationship with a grandchild. See Ortiz v. John D. Pittenger Builder, Inc., 382 N.J. Super 552, 558 (Law Div. 2004).

the elements of Portee narrowly.  The Portee Court described at length the special nature of parental love and of a mother's instinctive love.  To our knowledge, the Court has not broadened this class to include materteral (aunt) or avuncular (uncle) relationships.  Nor, as mentioned above, did the McDougall Court include an aunt-nephew relationship in the list of intimate familial relationships it had recognized.

We conclude it is not within the province of this Court to expand the scope of the protected class of persons falling under New Jersey bystander emotional distress law under these facts. This deference is particularly important considering the New Jersey Court's counsel to define the class narrowly.  Therefore, this Court construes New Jersey law to hold that at present, an aunt-nephew relationship, without more, is not an intimate familial relationship protected under the rules of Portee and Frame.

Notwithstanding our conclusion, we are also mindful that the Supreme Court of New Jersey has expressly rejected drawing a "bright line" to define a bystander-victim relationship. See Dunphy v. Gregor, 136 N.J. 99, 108 (1994).[5]  Instead of a bright

---

[5] In Dunphy, the New Jersey rejected the California Court's bright line test which held that a fiancé who cohabitated with her fiancé did not have an intimate familial relationship with him because of the "clear rule" that liability would be limited to persons closely related by blood or marriage. Id. at 106-07. The New Jersey Court opted not to use a bright line test in part

line test, the New Jersey Court embraces using a traditional tort analysis in considering a bystander liability cause of action:

> Nothing in our experience with bystander liability counsels a departure from our accustomed application of the traditional principles of tort law.  Rather, we are convinced that the solution to the posed question lies not in a hastily-drawn "bright line" distinction between married and unmarried persons but in the "sedulous application" of the principles of tort law, which inform our ultimate determination that a particular claimant is owed a duty of care.

Id.  In applying the traditional principles of tort law to the facts in this action, the central question becomes, "Did the health care providers owe a duty of reasonable care to the aunt, Miletzy, as to their acts involving the newborn, Bryan?"  We conclude that they did not.

The Court described the law regarding duty: "In the law of negligence, including that pertaining to family torts, the scope of a duty depends generally on the foreseeability of the consequences of a negligent act, as limited by policy

---

because it concluded that unlike California's experience, bystander liability was not becoming too expansive and burdensome in New Jersey. Id. at 108.  The Court explained, "In short, we have countenanced no rapid or radical expansion of bystander liability since Portee." Id.  Rather, the Supreme Court of New Jersey said the two states' experiences were not parallel because the New Jersey Courts had applied the elements of Dillon and Portee restrictively. Id. at 105-06.  The New Jersey Court also rejected the California Court's approach of drawing a bright line in order to have a "sufficiently definite and predictable test to allow for consistent application from case to case." Id. at 105 (quotations and citations omitted).

considerations and concerns for fairness." <u>Carey</u>, 132 N.J. at

57; <u>see also</u>, <u>Dunphy</u>, 136 N.J. at 108.  Our analysis of the duty

owed to Hernandez by the health care providers focuses,

therefore, on: (1) foreseeability, (2) public policy, and (3)

fairness.

The Court explained the connection between foreseeability

and an intimate familial relationship:

> One can reasonably foresee that people who enjoy an
> intimate familial relationship with one another will
> be especially vulnerable to emotional injury resulting
> from a tragedy befalling one of them.  Foreseeability
> based on that standard, as recognized by the Appellate
> Division majority, preserves the distinction that must
> be made between ordinary emotional injuries that would
> be experienced by friends and relatives in general and
> those indelibly stunning emotional injuries suffered
> by one whose relationship with the victim at the time
> of the injury, is deep, lasting, and genuinely
> intimate.

<u>Dunphy</u>, 136 N.J. at 109, 110 (quotations and citations omitted).

Thus, New Jersey law draws a distinction between (1)

"friends and relatives in general" who might experience ordinary

emotional injuries and (2) those who at the time of the injury

had a "deep, lasting, genuinely intimate" relationship with the

victim.  Simply being a relative alone is insufficient to

satisfy the foreseeability requirement.

The <u>Dunphy</u> Court discussed the factors that should be

considered in determining whether a relationship is an intimate

familial relationship:

> That standard must take into account the duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, the extent and quality of shared experience, and, as expressed by the Appellate Division, whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day to day relationship, and the manner in which they related to each other in attending to life's mundane requirements.

Dunphy, 136 N.J. at 112 (citation and quotation omitted).

In deciding that a cohabitating fiancé had an intimate familial relationship with her fiancé, for example, the Supreme Court of New Jersey concluded:

> An intimate familial relationship that is stable, enduring, substantial, and mutually supportive is one that is cemented by strong emotional bonds and provides a deep and pervasive emotional security. We are satisfied that persons who enjoy such an intimate familial relationship have a cognizable interest in the continued mutual emotional well-being derived from their relationship. When that emotional security is devastated because one witnesses, in close and direct proximity, an accident resulting in the wrongful death or grievous bodily injury of a person with whom one shares an intimate familial relationship, the infliction of that severe emotional injury may be the basis of recovery against the wrongdoer.

Dunphy, 136 N.J. at 115.

Hernandez did not have the intimate familial relationship described by Dunphy. It is difficult to imagine a loss more painful that the death of a newborn, but it would be impossible for Hernandez to have the "stable, enduring, substantial, and mutually supportive" relationship with the newborn whom she

never saw alive.[6]  For the same reason, she did not have a
relationship with him "that [was] cemented by strong emotional
bonds" and a "deep and pervasive emotional security." Id.  There
was no relationship, no mutual dependence, no common
contributions to life together, no shared experiences and no
shared household.  Hernandez's statement that "Bryan's mother
and sister, Olga, resided with his aunt Miletzy Hernandez when
he was in utero[.]" (Docket No. 90-1 at 5.) does not change our
conclusion.  Nor does her assertion that she accompanied and
stayed with the baby's mother throughout labor and delivery
change our calculus.  Her love and support for her sister and
her baby notwithstanding, she does not have an intimate familial
relationship as described by Dunphy.

Nor are the claims of Hernandez cognizable under Carey, 132
N.J. 44 (1993), which involved negligent obstetrics care.  The
Court discussed whether the mother and the father were making
direct or indirect claims.  The New Jersey court drew a clear
distinction between a mother's and a father's relationship to a
newborn and naturally elevated the former over the latter.  An
aunt's relationship to the newborn, is more remote than the
mother's relationship to the baby, and ordinarily, more remote
than the father's relationship to the baby.

---

[6] This excludes the moment the operating room door was open when
she might have seen him alive.

20

The Carey court discussed the dichotomy of the mother's and
father's relationship to the baby during childbirth given her
unique physiological connection to the baby. Id. at 56-62.  The
Court observed that the mother, as a matter of simple biology,[7]
necessarily has an intimate familial relationship with her
newborn.  On the other hand, the Court held, whether a father
does depends upon whether his relationship has the intimacy to
support such an action. Carey, 132 N.J. at 60-61.  A father does
not automatically have an "intimate familial relationship"
status because "[n]o matter how intimately involved in the birth
of his child the father may be, his role differs from that of
the mother." Id. at 60.[8]  Rather, in the case of the father,

---

[7] Carey, 132 N.J. at 59 ("Our analysis begins by recognizing that
the physical and emotional ties between mother and fetus so
unite them that a physician should anticipate that any
malpractice that adversely affects the fetus will cause
emotional distress to the mother.")

[8] In Carey, the Court distinguished between the mother's  and
father's claim for emotional distress. Id. at 56-62.  As the New
Jersey Supreme Court later noted:

> If the obstetrical malpractice occurs during
> pregnancy, and the fetus, although born alive, suffers
> injuries that are ultimately fatal, the child may
> plausibly be considered as the primary victim.  It
> does not necessarily follow, however, that the
> mother's claim for emotional distress that arises from
> the victimization of her infant should be considered
> an indirect claim.  In that setting, the special
> requirements that are imposed to establish an indirect
> claim for negligent infliction of emotional distress,
> as exemplified by Portee, would appear to be
> superfluous.  Those special requirements serve to

courts must determine whether he has "an intimate family relationship to the mother and baby" and whether he was "drawn sufficiently into the treatment of the mother and the baby" to conclude the physician's duty to him is like that owed to the mother. Id. at 61.

We are unable to conclude on these facts that Hernandez's relationship with her newborn nephew – one ordinarily more attenuated than that of a father and child - is equivalent to the parents' relationship with their newborn child so as to make the health care providers' duty to her a foreseeable one. Unlike her sister, Hernandez was not biologically intertwined with the baby during the gestation period. See Gendek, 139 N.J. at 298 ("[A] pregnant woman and her fetus are one physiological unit[.]").  She did not endure months of pregnancy.  She did not

---

assure the genuineness of the claim for emotional distress and the basic fairness and reasonableness in imposing liability for that kind of emotional distress on the tortfeasor.  However, no need exists, as recognized by Carey, to impose on the mother, who has herself been a victim of malpractice during pregnancy or the delivery of her child, the added requirements that she "be contemporaneously aware of the malpractice and the injury of her fetus" or be "shocked" by the malpractice.  Her emotional distress over the condition and fate of her newborn baby is unquestionably immediate and genuine and inextricably related to the malpractice.

Gendek v. Poblete, 139 N.J. 291, 298-99 (quoting Carey, at 60).

go through the pain of labor and childbirth.  Unlike Mendez, she did not have a doctor-patient relationship with the health care providers.  She had neither legal rights nor responsibilities as to the baby.  And, as we previously explained, she did not have the Court-recognized profound parental love.

Nor does her relationship equate with that of a father.  She was not the baby's parent and therefore not immediate family.  Again, she had no legal rights and no responsibilities for the baby.  She had no financial obligations for the baby.  Her name was not on the birth certificate.  She did not share the doctor-patient relationship with the mother and the baby's health care providers.  She was not sufficiently drawn into the obstetrics care for the mother and baby.  Her relationship did not have the intimacy to support such an action.  For all of these reasons, it was not foreseeable to the health care providers that Hernandez would sustain emotional harm as a result of their negligent actions.

Defendants argue that under Carey, only "a mom and a dad" can bring claims for emotional distress based upon negligence affecting a fetus. (Docket No. 92 at 2.)  They say only direct claims and not bystander claims are actionable under Carey. (Docket No. 92 at 2.)  They contend that an aunt's claim would be indirect, and for that reason, not cognizable under Carey. They argue that "Miletzy cannot establish an intimate familial

relationship because she never developed a relationship with the fetus." Id.  Their conclusion is "That is why the law says it is a direct claim only when the injury involves a fetus—only mom and dad have that standing to pursue such a claim." Id.

Contrary to Defendants' contention, Carey did not hold that only mothers and fathers can bring a claim for emotional distress involving harm to a fetus because both are direct claims. As we discuss below, Carey held that a father's obstetrics malpractice claim would be an indirect claim, not a direct claim.[9]  This characterization as indirect would not bar him from bringing a claim.  Therefore, it follows that neither would characterizing an aunt's claim as indirect bar her from bringing a claim.

In Carey, the Court minimized the importance of the classifications.  They concluded the characterization of the claim as direct or indirect should have no bearing on whether the person could bring an action: "The characterization of a claim as direct or indirect, although useful for distinguishing claims in which the source of the emotional distress is an injury to the claimant from those in which the injury is to

---

[9] The Supreme Court of New Jersey has provided that only parents may bring a wrongful birth action for the policy reason discussed in Michelman, see supra note 4, but it appears the Court has not applied this sweeping rule to obstetrics malpractice actions involving the negligent care and delivery of a baby.

another, should not predetermine the rights of the parties."
Carey, at 57.

If the Court's discussion in Carey about the complexities
of the direct and indirect classifications of mothers and
fathers claims resulted in any ambiguity about the
classification of a father's claim,[10] the ambiguity later faded
away, as in Gendek the Court said: "[In Carey], the father,
unlike the mother, was not a direct object of any medical
malpractice, and consequently his claim was considered to be an
indirect claim for emotional distress." Gendek v. Poblete, 139
N.J. 291, 299-300 (1995).

Thus, we do not agree that Carey holds that only a "mom and
dad" can bring an action involving a fetus because only they
have direct claims in such actions.  While, ultimately we agree
with Defendants that Hernandez does not have a cognizable claim,
we come to that conclusion on other grounds.

---

[10] Justice Handler in Carey v. Lovett, 132 N.J. 44, 70-74
(1983)(Handler, J. concurring), spoke about the majority's
characterization of claims in his concurring opinion.  He said
"I am puzzled and troubled by the Court's reasoning, which in
some ways relegates the mother to the status of a mere bystander
when it is painfully obvious that she herself is the patient."
Id. at 71.  He also argued the father should not be regarded as
a "bystander in the treatment of his wife." Id. at 74.  He said
the Court had decided a duty was owed to both the mother and
father in other cases involving newborns, such as those
concerning malpractice in genetics counseling, and he argued
that both parents should have a direct claim, here, as well. Id.
at 73-74.

New Jersey courts look not only to foreseeability when analyzing whether the providers owe a duty, but also to public policy:

> Our concern is not only with the genuineness of emotional-distress claims and speculative damages but also with the effects of the expansion of liability on the medical profession and society.  Expanding liability should entail the balancing of many interests: a weighing of the relationships of the parties, the nature of the risk, and public interest in the proposed solution.  Malpractice insurance premiums for all health care providers have risen from $60 million in 1960 to $7 billion in 1988; $5 billion of these premiums are paid by physicians.  These premiums are a very substantial portion of the $105 billion directly spent on physicians' services in 1988.

Carey, 132 N.J. at 58, 59 (quotations and citations omitted.)

In the concurring opinion in Frame v. Kothari, 115 N.J. 638 (1989), Chief Justice Wilentz and Justice Garibaldi echoed this sentiment.  They explained, "The torts process, like the law itself, is a human institution designed to accomplish certain social objectives.  Courts have always shaped the law of negligence to further societal interests in curtailing or encouraging certain types of behavior." Id. at 650 (citation and quotation omitted).  They added, "These societal interests must be protected through continual re-evaluation." Id. at 651.

Chief Justice Wilentz and Justice Garibaldi warned about the costs to society of increasing medical malpractice liability:

> We suspect that the cost to society of expanding
> medical malpractice liability to allow a family member
> to recover for his or her emotional distress as a
> result of a physician's improper diagnosis will
> outweigh the benefits to society.  Possible costs to
> society include the increasing number of physicians
> who refuse to practice in certain fields, the cost, in
> all fields, of an increase in "defensive
> medicine," and the increasing cost of medical
> treatment itself.  The loss is the failure to
> compensate for the suffering of family members arising
> from the death or serious injury of a loved one caused
> by medical malpractice.

Id. at 651-52. (footnotes with citations and quotations

omitted).

We see nothing in New Jersey law that suggests the New

Jersey Supreme Court would strike this public policy balance

differently now than they did in Frame and expand the class of

individuals capable of bringing bystander emotional distress

actions.  The New Jersey Supreme Court would likely conclude

that expanding the foreseeable class of potential plaintiffs to

a virtually unlimited class of aunts, uncles, cousins and other

extended family members in a bystander action involving

obstetrics malpractice and a newborn would not serve the public

interest.  Expanding liability to that degree would be

inconsistent with the restrictive construction of the class as

articulated by the precedents of that Court.  And importantly,

no additional appreciable deterrence would be gained by adding

an aunt to the class of potential plaintiffs. See Frame, 115

N.J. at 652(concurring opinion)("We do not believe that the

majority achieves any additional deterrence given the present state of medical malpractice liability.")(Footnote with citation omitted.)

Lastly, we look to fairness.  In Portee, the Court quoted Chief Justice Weintraub who described fairness and duty: "Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." Portee at 101 (citing Goldberg v. Housing Auth. Of Newark, 38 N.J. 578 (1962)(emphasis in original.)  We conclude it would be unfair for the health care providers to owe a duty of care to Hernandez.  The health care providers did not have a doctor-patient relationship with Hernandez.  The doctor-patient relationship was only between the providers and the mother and the baby.  The risk was very targeted — to the baby. Expanding the protected class would not change that.  Finally, in concluding that an aunt is not included in the protected class, we address the interest in "prevent[ing] liability from exceeding the culpability of defendant's conduct." Portee, at 101.

Admittedly, as to fairness, the Carey Court recognized the absence of a physician-patient relationship between a father and a doctor.  Regarding a father, they said "The absence of such a relationship, however, does not necessarily preclude the

28

existence of a duty extending from the physicians to the
father." Carey, 132 N.J. at 61.  The Court said, "When the
father is drawn sufficiently into the treatment of the mother
and the baby, the physician's duty to him is like that owed to
the mother." Id.  So while the father might not, de jure, have a
relationship with the health care providers, the Court
overlooked this if a father were de facto sufficiently involved
in the treatment of the mother and baby.  The Court has not
drawn a parallel analysis for other relatives of the baby.

By opening the obstetrics team up to liability to an aunt,
and by extension to others outside the nuclear family who may be
bystanders to malpractice, obstetrics health care providers
could be exposed to unprecedented liability to third parties.
We are confident that New Jersey courts would view this result
as unfair to the medical profession.

For all these reasons, this Court concludes that under a
traditional tort analysis as defined by the New Jersey courts,
on the facts of this case, the doctors did not owe a reasonable
duty of care to Miletzy regarding any malpractice involving
Bryan and Mary.  In reaching this result, we recognize that we
are drawing a line.  The Supreme Court of New Jersey explained
it is the business of the courts to draw lines:

> Whenever a court draws lines, it risks the criticism
> of arbitrariness.  Drawing lines, however, is the
> business of the courts, and lines must be drawn to

29

> provide remedies for wrongs without exposing
> wrongdoers to unlimited liability.  Our task is to
> draw the boundary of a claim that permits recovery for
> the added stress caused by medical misdiagnosis
> without unreasonably burdening the practice of
> medicine.

Id., 115 N.J. at 649.  We are confident that this is the line

the Supreme Court of New Jersey would draw.

### Frame:  Observation of Malpractice

Even if Hernandez had satisfied the intimate familial

relationship prongs of Portee and Frame, by her own admissions,

she cannot satisfy the Frame special requirements that she

observed the malpractice and immediately connected it to the

injury or death.  As mentioned above, these special requirements

in Frame are strictly applied.  Gendek, 139 N.J. at 297.

As to medical malpractice cases in other jurisdictions

wherein the emotional distress claims were denied, the Supreme

Court of New Jersey in Frame explained:

> [T]he common thread running through these cases is
> that a misdiagnosis normally does not create the kind
> of horrifying scene that is a prerequisite for
> recovery.  Rarely will a member of the patient's
> family contemporaneously observe the immediate
> consequences of the defendant's misdiagnosis, and even
> more rarely will the consequences of the misdiagnosis
> be the injury or death of a loved one contemplated by
> the gruesome scene portrayed in Portee.

Frame, 115 N.J. at 647-48.

Hernandez says when she saw a doctor and nurse running to

the operating room, she believed "Mary Mendez, the baby, or both

had been injured as a result of medical negligence by Nurse
Kelley in the delivery room, by member(s) of the ob/gyn team in
the operating room, or both." (Docket No. 90-1 at 4). Her
assertions that: (1) someone (Nurse Kelley, the OB/GYN team or
both); (2) might have given some kind of negligent care (a lack
of oxygen, the failure to timely use a fetal heart monitor, some
other unspecified inadequate care or some act or inaction in the
operating room); (3) with the negligent care being given to
someone (Mendez, the baby or both); (4) at some place (either in
the labor room or the operating room or both); (5) thus possibly
in her presence or not in her presence; (6) resulting in the
baby's later tragic demise while not in her presence are too
speculative and remote to satisfy the strict requirements of
Frame and Gendek.

     As to the purported malpractice, she is not able to answer
the simple questions of "Who?" did "What?" "To whom?" and
"Where?" and "When?"  Speculating or assuming without any
foundation, knowledge, medical training, or something more, that
the care to someone, witnessed or not witnessed, might be
negligent, is not contemporaneously observing malpractice for
purposes of this law.

     Hernandez expressly admits she was barred from entering the
operating room. (Docket No. 90-1 at 8.)  While she says she
could see into the room when the door was opened by the doctor,

she does not allege that she observed the operation.  She observed the doctor and nurse running to the operating room to administer urgent care to the baby, but this does not qualify as observing malpractice.  She saw the baby intubated and motionless through the operating room door, and did not know if the baby were alive, however this was not observing malpractice.

Hernandez did not see the fetal heart rate dropping to 60's or 70's from 140's.  She did not see the baby in distress.  Nor did she see the baby limp at birth and then not moving.  She was not present when the baby was pronounced dead.  While seeing her deceased nephew not long after delivery was likely very distressing, she witnessed the result of the asserted malpractice and not the act of malpractice.  Our conclusion is that because no reasonable juror could find that she contemporaneously observed the malpractice, she could not have connected the malpractice with the baby's death as required by Frame and Gendek.

**CONCLUSION**

In sum, as to a bystander emotional distress action involving malpractice in the delivery of a baby, under New Jersey law: (1) on these facts an aunt is not within the class of persons who has an "intimate familial relationship" with her newborn nephew and (2) even if Hernandez were within the class

of persons who could have an intimate familial relationship with a newborn, under a traditional tort and negligence analysis, she was owed no duty of reasonable care by the health care providers who delivered and cared for her sister's baby.  Lastly, even if Hernandez did have an intimate familial relationship with her nephew, she did not observe the medical malpractice and therefore did not meet the strict special requirements of <u>Frame</u> and <u>Gendek</u>.

We pause to note that in reaching this conclusion, we do not mean to minimize the grief and sadness Hernandez no doubt feels over the loss of her nephew.  But as the Appellate Division of the New Jersey Superior Court observed in a similar context, there must be reasonable limitations on who can recover for their emotional harm:

> Here defendants violated a duty owed Harold Brehm. While this no doubt caused Bernadette Brehm emotional distress, there must be some reasonable limitation on who may be awarded damages for improper conduct.  In many situations wrongful conduct by a person may cause emotional distress to third parties.  For example, wrongful discharge of an employee may cause severe emotional distress to the employee's spouse. Similarly, medical malpractice resulting in injury to a patient could result in emotional distress to the patient's spouse.  In our view extension of the right to recover to Bernadette Brehm in this case would be unreasonable.

<u>Brehm v. Pine Acres Nursing Home</u>, 190 N.J. Super. 103, 110 (App. Div. 1983)(dismissing emotional distress action by wife of nursing home patient brought against nursing home and others).

33

Here, as in <u>Brehm</u>, there must be some reasonable limit on who may recover for the negligence of others.  In light of the important policy considerations in a case of this kind, we leave it to the New Jersey Supreme Court to expand the scope of liability for bystander emotional distress claims, if they so decide.[11]

Accordingly, the Court will grant the motion of the Co-defendant, the United States of America, to join this motion, as referenced in Footnote 1.  Defendants' motion for partial summary judgment will be granted as to all the claims of Plaintiff Miletzy Hernandez.  Appropriate Orders will be entered.


Dated: December 7, 2016          s/ Noel L. Hillman
At Camden, New Jersey            Noel L. Hillman, U.S.D.J.

---

[11] In a Pennsylvania action, the Superior Court of Pennsylvania affirmed the dismissal of a complaint against a landowner in a bystander negligent infliction of emotional distress action. The action was brought by a cousin who had witnessed his cousin drown in a pool. <u>Blanyar v. Pagnotti</u>, 451 Pa. Super. 269, (1996) <u>aff'd</u>, 551 Pa. 313 (1998)(per curiam)(internal citation omitted).  While the decision involves Pennsylvania law, the issues are similar and the discussion is illuminating.  In terms of public policy, the Court said, "Were we to accept appellant's argument and hold actionable all emotional trauma causally connected to the Defendant's tortious conduct, we would [wreak] upon our society a problem of unlimited or unduly burdensome liability." <u>Blanyar</u>, 451 Pa. Super. at 277.  The Court added, "Moreover, because of the important and far reaching public policy concerns involved, any further extension of recovery for the tort for negligent infliction of emotional distress should come from our Supreme Court." <u>Id</u>.  The same holds true here, as to the New Jersey Supreme Court.